IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SEMINOLE NATION OF OKLAHOMA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. CIV-06-556-SPS |
| KENNETH L. SALAZAR, Secretary of the Interior, et al., | ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

In December 2006, the Seminole Nation of Oklahoma initiated this litigation against the Secretary of Interior, Secretary of the Treasury, and the Special Trustee in the Office of Special Trustee for American Indians to request an accounting of tribal trust assets in an effort to ensure that those assets were being properly managed for the benefit of the Tribe. *See*, Complaint [Docket No. 2]. After more than four years of litigation and participation in four settlement conferences, the parties agreed in principle to a settlement agreement and requested that this court enter an administrative closing order which granted the parties until March 27, 2012 to file closing papers. The reason for the delay between the administrative closing order and the deadline to file closing papers was to allow the parties time to comply with certain procedural requirements, tribal and governmental, necessary to gain ultimate approval of the settlement agreement. On June 28, 2011, the undersigned granted the parties' requests and signed an Administrative Closing Order. [Docket No. 127].

On July 20, 2011, the Dosar-Barkus Band, one of fourteen representative Bands that constitute the Seminole Nation of Oklahoma, filed its Motion to Intervene alleging that it met the requirements for intervention of right under Fed. R. Civ. Pro. 24(a) or, in the alternative, permissive intervention under Fed. R. Civ. Pro. 24(b).[1]  [Docket No. 128]. More specifically, the Band claims that it possesses a "legal financial interest as beneficiaries to the judgment fund" and that the Seminole Nation of Oklahoma and the Defendants "have both expressed their intention to exclude the Freedmen from settlement negotiations, and as well as exclude them from the distribution plan" of any monetary settlement the parties may eventually agree upon.  *See*, [Docket No. 128-1], p. 7.

Given the arguments advanced by the Band, it is important to briefly outline the history of the "Judgment Fund" award that the Band specifically refers to throughout its argument.  In 1950 and 1951, the Seminole Indians of the State of Florida and the Seminole Nation of Oklahoma initiated separate claims against the United States requesting adequate compensation for lands relinquished to the United States by the 1832 Treaty of Camp Moultrie. The claims filed by the Seminole Indians of Florida and the Seminole Nation of Oklahoma were consolidated by the Indian Claims Commission, and in 1964, the Commission determined that in 1823, the tribes held aboriginal title to 23,892,626 acres located in the present-day state of Florida.  On April 27, 1976, the Indian Claims Commission approved a settlement agreement between the parties

---

[1] It should be noted at the outset that the because the Dosar-Barkus Band failed to set forth an accompanying pleading, *i. e.*, a Complaint in Intervention, the Band wholly failed to comply with Fed. R. Civ. Pro. 24(c), which states that "[a] motion to intervene . . . must state the grounds for intervention *and be accompanied by a pleading that sets out the claim or defense for which intervention is sought*." Fed. R. Civ. Pro. 24(c) [emphasis added].

concerning the value of the aboriginal land, and entered judgment in favor of the Seminole Indians of the state of Florida and the Seminole Nation of Oklahoma in the amount of $16,000,000.  The Commission specified that the judgment was entered "on behalf of the Seminole Nation as it existed in Florida on September 18, 1823[.]" *Seminole Indians of the State of Florida, et al. v. United States*, 38 Ind. Cl. Comm. 62, 90 (1976).

In 1990, Congress passed an act which set forth the criteria for the use and distribution of the "Judgment Fund" award that resulted from the Florida land litigation, which distributed the judgment between the Seminole Nation of Oklahoma and three separate Seminole Indian tribes located in Florida, *i. e.*, the Seminole Tribe of Florida, the Miccosukee Tribe of Indians of Florida, and the independent Seminole Indians of Florida.[2]  *See, Indian Claims: Distribution of Funds to Seminole Indians*, Pub. L. No. 101-277, 104 Stat. 143 (1990).  This Act further allowed the Seminole Nation of Oklahoma (in consultation with the Secretary of the Interior) to develop and prepare a plan for the use and distribution of the funds that were allocated to them.  *Id.* Subsequently, the Usage Plan prepared and submitted to Congress by the Seminole Nation of Oklahoma allowed the tribal governing body to develop and fund programs related to, *inter alia*, health, education, and social services and became effective on May 15, 1991.  Department of the Interior, Bureau of Indian Affairs, *Plan for the Use of the*

---

[2] The delay between the award from the Indian Claims Commission and the distribution of the award to the Seminoles was due to the "complete inability of the Seminole Nation of Oklahoma, on the one side, and the three Seminole Indian tribes of Florida to agree upon a formula for division of the funds."  136 Cong. Rec. H1348-05, 1990 WL 46287 (1990).

*Seminole Nation of Oklahoma Indian Judgment Funds in Docket Nos. 73 and 151 Before the Indian Claims Commission*, 56 FR 32480-01, 1991 WL 290057 (July 16, 1991).

In accordance with the Usage Plan, the Seminole Nation enacted various laws and ordinances that set out the criteria for participation in judgment fund programs with most programs requiring that an individual provide proof that he or she be a descendant of "a member of the Seminole Nation as it existed in Florida on September 18, 1823."  *See, e.g.*, Code of Seminole Nation of Oklahoma, Title 18-A, Ch. 2, Section 202(a).  The "descendancy requirement" in place for many of these programs is rooted in the Indian Claims Commission's judgment "on behalf of the Seminole Nation as it existed in Florida on September 18, 1823, *see*, *Seminole Indians*, 38 Ind. Cl. Comm. at 90, and is due to the fact that Seminole Freedmen, or "Estelusti," were not made members of the Seminole Tribe until 1866.  *See*, *Treaty with the Seminole*, Mar. 21, 1866, U.S.-Seminole Nat., 14 Stat. 755, 1866 WL 18781, at *2.  ("[I]nasmuch as there are among the Seminoles many persons of African descent and blood, who have no interest or property in the soil, and no recognized civil rights, it is stipulated that hereafter these persons and their descendants, and such other of the same race as shall be permitted by said nation to settle there, shall have and enjoy all the rights of native citizens, and the laws of said nation shall be equally binding upon all persons of whatever race or color, who may be adopted as citizens or members of said tribe.").  Individual members may satisfy the descendancy requirement by obtaining a Certificate of Degree of Indian Blood (CDIB) card, which is issued by the BIA, which references the "Seminole Blood Roll" created by the Dawes Commission in 1906; Seminole Freedmen were enrolled on a separate roll, *i.*

*e.*, the "Freedmen Roll," by the Dawes Commission at that time.  The CDIB requirement

has thus effectively excluded Freedmen members of the Seminole Nation of Oklahoma

from participation in Judgment Fund programs.   While attempting to resolve the

differences between the Seminole Indians of Florida and the Seminole Nation of

Oklahoma regarding the distribution of the Judgment Fund, Congress recognized the

Bureau of Indian Affair's Results of Research Report, which "determined that the

Freedmen of Oklahoma were ineligible to share in the awards because their ancestors

became members of the Seminole Nation in 1866, 43 years after the date of land taking in

1823.  *See*, H.R. Rep. 101-399, *P.L. 101-277, Providing for the Use and Distribution of*

*Funds Awarded the Seminole Indian in Dockets 73, 151, and 73-A of the Indian Claims*

*Commission*, 1990 WL 259120.  The Band opposes their exclusion from participation in

programs funded by the land litigation Judgment Fund, and this opposition is the basis for

their motion to intervene.

## I.      Intervention of Right

Intervention is governed by Fed. R. Civ. P. 24.  The rule provides for two methods

of intervention: intervention of right and permissive intervention.  Intervention of right

under Fed. R. Civ. Pro. 24(a) provides that

> [o]n timely motion, the court must permit anyone to intervene who . . .
> claims an interest relating to the property or transaction that is the subject
> of the action, and is so situated that disposing of the action may as a
> practical matter impair or impede the movant's ability to protect its interest,
> unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).  Thus, in order to intervene of right, the proposed intervenor must satisfy four requirements: "1) timeliness; 2) a cognizable interest; 3) impairment of that interest; and 4) lack of adequate representation by existing parties."  *Seminole Nation of Oklahoma v. Norton*, 206 F.R.D. 1, 8 (D.D.C. 2001), *citing Williams & Humbert, Ltd. v. W. & H. Trade Marks, Ltd.*, 840 F.2d 72, 74 (D.C. Cir. 1988).  The Band argues first that it should be allowed to intervene of right because its application satisfies the requirements outline above.

### a.  Timeliness[3]

"'When the applicant appears to have been aware of the litigation but has delayed unduly seeking to intervene, courts generally have been reluctant to allow intervention.'"  *Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.*, 619 F.3d 1223, 1232 (10th Cir. 2010), *quoting* 7C Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1916, at 539-40 (3d ed. 2007).  But courts must consider timeliness "in light of all of the circumstances."  *Sanguine, Ltd. v. United States Department of the Interior*, 736 F.2d 1416, 1418 (10th Cir. 1984), *citing NAACP v. New York*, 413 U.S. 345, 366 (1973).  The Tenth Circuit has identified several factors courts should consider when addressing timeliness in the context of intervention: 1) the length of time the movant knew of its interests in the case; 2) prejudice to the existing parties; 3) prejudice to the movant if not allowed to intervene; and 4) any unusual circumstances

---

[3] The timeliness discussion is equally applicable to the Band's argument regarding intervention of right under Fed. R. Civ. Pro. 24(a) and permissive intervention under Fed. R. Civ. Pro. 24(b), as both means of intervention require timely filing.

that may exist.  *Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.*, 619 F.3d 1223, 1232 (10th Cir. 2010); *see also, Sanguine, Ltd.*, 736 F.2d at 1418.

The Band argues that its Motion to Intervene filed three weeks subsequent to the Court's administrative closing order is timely, as the "totality of the circumstances," *i. e.*, that the Band "just recently learned that neither party intends to represent the [Band's] interest during negotiation settlements" and that the parties "appear to be accelerating the completion of the settlement agreement to prohibit the Freedmen from intervening in the action," weigh in favor of a finding that the motion to intervene is timely filed.  [Docket No. 128-1], p. 5.

It is difficult for the court to accept the Band's bald assertion that it only recently became aware that neither party intends to represent the Band's interest during settlement negotiations.[4]  First, it is important to note that the instant lawsuit has been pending in this court since December 29, 2006, so the Band's motion to intervene comes more than *four years* after the initiation of litigation.  Second, the parties to the lawsuit have participated in *four* separate settlement conferences with the Honorable Kimberly E. West, United States Magistrate Judge, between March and June 2011.  Finally and perhaps most importantly, the Band, like the other 13 groups that make up the Seminole Tribe of Oklahoma, has two members who are part of the Seminole Nation General Council, a body that has the constitutional authority under Article V of the Constitution of the Seminole Nation "[t]o negotiate with Federal, State and local governments and

---

[4] As the court explains *infra*, the Band's "interests" in this lawsuit far exceed the substantive scope of the lawsuit.  Thus, the court refers to the Band's interest as though it is legitimate in terms of the timeliness discussion.

others on behalf of the Nation."  The General Council has thus been consulted and has acted as the main decision-maker throughout the pendency of this lawsuit.  The General Council's participation is evidenced by the fact that on November 10, 2010, the parties filed a Joint Motion for Continuance of Settlement Conference, Modification of Schedule for Pre-Conference Discussion and Statement, and [Proposed] Order.  *See* [Docket No. 107].  Within that Motion, the parties stated the following: 1) the Constitution of the Seminole Nation vests the General Council with the authority to negotiate with the United States; 2) the General Council is responsible for preparing and entering a resolution outlining and approving the settlement offer to be made from the Tribe to the United States; and 3) more time was necessary in order to allow the General Council the opportunity to meet, debate, and deliberate regarding an acceptable settlement offer. Therefore, considering the General Council's constitutional authority to negotiate with the United States coupled with the fact that the Band has two representatives who are a part of the General Council, it is unreasonable for the Court to believe that the Band only just learned that its alleged interests will be threatened if they are not given a seat at the negotiating table.  Given that the instant lawsuit was over four years old at the time of the filing of the Motion to Intervene and the Band's full participation in this lawsuit via its General Council representatives, it occurs to the Court that if the Band's interests were not going to be adequately represented in the context of settlement negotiations, then the Band would have been aware of that long before the filing of the instant motion.  Thus, the Court concludes that the Band's motion is untimely.

Even if the Court found that the Band's motion to intervene was timely,[5] however, the Band still must prove the following elements in order to intervene of right under Fed. R. Civ. P. 24(a): 1) that it has a legally cognizable interest in the litigation; 2) that its interest will be impaired if not allowed to intervene; and 3) that the Band would receive inadequate representation of that interest from the existing parties.

### b.  Legally cognizable interest

"In order to intervene of right, the interest of applicants in the property or transaction must be 'of such a *direct* and *immediate* character that the intervenor will either gain or lose by the *direct* legal operation and effect of the judgment." *Osage Tribe of Indians of Oklahoma v. United States*, 85 Fed. Cl. 162, 168 (2008) [hereinafter, *Osage VI*] [emphasis in original], *quoting American Maritime*, 870 F.2d 1559, 1561 (Fed. Cir. 1989).  Thus, "[t]he interest . . . may not be either indirect or contingent." *Osage VI*, 85 Fed. Cl. at 168 [internal citations omitted].  In addition, the interest must also be legally protectable, which means that the interest must be "one which the substantive law recognizes as belonging to or being owned by the applicant."  *Id.* at 170 [internal citations omitted].  Further, in order for an interest to be legally protectable, "'the claim the applicant seeks intervention in order to assert [must] be a claim as to which the applicant is the real party in interest.'"  *Id.*, *citing New Orleans Public Service, Inc. v. United Gas Pipeline Co.*, 732 F.2d 452, 464 (5th Cir. 1984).  "The 'real party in interest' is the party who, by substantive law, possesses the right sought to be enforced, and not

---

[5] While failure to timely file a motion for intervention is fatal, the Court will consider the remaining elements of Fed. R. Civ. Pro. 24(a).

necessarily the person who will ultimately benefit from the recovery." *New Orleans*, 732 F.2d at 464, *quoting United States v. 936.71 Acres of Land*, 418 F.2d 551, 556 (5th Cir. 1969).

With regard to its interest, the Band asserts that "the original parties to the case are currently undergoing settlement negotiations to devise a plan to distribute judgment fund proceeds to Seminole citizens" which excludes the Band from any distribution of potential settlement proceeds. Further, the Band argues that as Seminole citizens, they are "beneficiaries with legal interests in the distribution of settlement proceeds from the judgment fund." Because of their beneficiary status, they argue that they have a cognizable financial interest in the litigation. The Band misinterprets and overstates the purpose of the instant litigation.

First, the Court finds that the Band's interest in the instant litigation (aside from the interest they may share with the Seminole Nation to ensure that tribal trust assets are being properly managed) is speculative at best. Their entire claim rests on the notion that the settlement agreement, the terms of which are as yet unknown, will provide for the distribution of funds awarded as a result of this litigation and that the distribution will continue to freeze the Band out of judgment fund benefits that they claim are owed to them by virtue of their status as citizens of the Seminole Nation. In the instant lawsuit, the Seminole Nation has merely alleged that the United States has mismanaged tribal trust assets in violation of the trust duty the United States owes to the Seminoles, making the sole purpose of this litigation to determine whether there has been a violation of that trust duty, not to determine who among the Seminole Nation is entitled to enjoy the

benefits of any potential monetary settlement.  Thus, the Band's interest is not "of such a direct and immediate character that [it] will either gain or lose by the direct legal operation and effect of the judgment."  *Osage VI*, 85 Fed. Cl. at 168 (2008).

Even if the Band's interests *were* directly at issue in this lawsuit, the Court cannot find that the Band has a *legally protectable* interest.  A legally protectable interest must be "more than merely an economic interest," must be "one which the substantive law recognizes as belonging to or being owned by the applicant," and the prospective intervenor must be the real party in interest in the underlying claim.  *Osage VI*, 85 Fed. Cl. at 170.

The Band posits that because the Tenth Circuit "found that Congress intended to include the Freedmen in the distribution" of the Judgment Fund resulting from land litigation in the Indian Claims Commission, they should be entitled to intervene of right in this lawsuit to protect their interest in Judgment Fund proceeds.  [Docket No. 128-1], p. 6.  The problem with this argument is that the Tenth Circuit never found that the Freedmen were supposed to have been included as beneficiaries in the Judgment Fund but were somehow left out.  As it stands now, the Band's members are *not* beneficiaries of the Judgment Fund, because tribal ordinances require that participants possess a valid CDIB card, which would be issued by the Bureau of Indian Affairs.

As mentioned, the subject matter of this litigation is alleged mismanagement of tribal trust assets held in trust by the United States for the benefit of the Seminole Nation.  "By definition, tribal assets are owned by the Tribes, not individual members."  *Round Valley Indian Tribes v. United States*, 102 Fed. Cl. 634, 637 (Fed. Cl. 2011).  The Band

may have a political or personal interest in the tribal trust assets at issue in this litigation, but their interest does not rise to the level of a "legally protectable interest." *See, id.* ("[A]lthough the Proposed Intervenors certainly have a political or personal interest in the disposition of tribal assets, they do not have any 'legally protectable interest' in tribal assets.").

Indeed, the Band in this case is in an even worse position than the headright holders who were denied intervention in *Osage VI*, 85 Fed. Cl. 162 (2008). In that case, the Osage Tribe had filed suit against the United States in the Court of Federal Claims for allegedly failing to collect, deposit, and invest revenues derived from the Osage mineral estate in violation of the trust duty owed by the United States to the Osage Tribe. *Osage Tribe of Indians of Oklahoma v. United States*, 68 Fed. Cl. 322 (Fed. Cl. 2005) [hereinafter referred to as *Osage I*]. Subsequently, individual headright holders (personal owners of allotted shares of Osage land) consisting of eight members of the Osage Tribe proposed to intervene, either permissively or of right, alleging that they possessed an interest in the lawsuit "based on their 'interest in income derived from the Osage mineral estate.'" *Osage VI*, 85 Fed. Cl. at 169. The court, however, found that while the headright holders held a direct interest in the litigation as the "amount that each headright holder ultimately receives is directly proportional to the amount of damages awarded," the headright holders were "not the 'real party in interest' because the Tribe, not the headright holders, [was] the direct trust beneficiary." *Id.* at 170. Therefore, the court concluded, the headright holders did not possess a *legally protectable* interest. Like the headright holders in *Osage VI*, the Band here does not have a legally protectable interest

because the Band is not the real party in interest.  The real party in interest is the Seminole Nation of Oklahoma, *i. e.*, the direct trust beneficiary.  Thus, the Seminole Nation, not the Band, possesses "the only substantive legal right it seeks to assert in the action," *i. e.*, an accounting of tribal trust assets.  *Id.* at 171.

Based on the foregoing, the Band does not have a direct and immediate legally protectable interest, which acts as a bar to granting intervention of right under Fed. R. Civ. Pro. 24(a).  *See Chippewa Cree Tribe of the Rocky Boy's Reservation, et al. v. United States*, 85 Fed. Cl. 646, 655 (2009) ("The finding that Proposed Intervenors do not meet the interest requirement . . . is a complete bar to granting intervention of right."), *citing Freeman v.  United States*, 50 Fed. Cl. 305, 309 (Fed. Cl. 2001).  Yet, the court will address the remaining factors in the Fed. R. Civ. Pro. 24(a) analysis.

## c.  Impairment of interest

Even if this court were to find that the Band possessed a direct legally protectable interest in the subject matter of this litigation, the Band has not shown that any interest that they have may be impaired if they are prevented from intervening.  "Litigation impairs a third party's interests when the resolution of the legal questions in the case effectively foreclose the rights of the proposed intervenor in later proceedings, whether through *res judicata*, collateral estoppel, or *stare decisis*."  *Ute Distribution Corp. v. Norton*, 43 Fed. Appx. 272, 279 (10th Cir. 2002), *citing FDIC v. Jennings*, 816 F.2d 1488, 1492 (10th Cir. 1987).

The Band is effectively asking this court to allow them to intervene in an action where the prayer for relief is an accounting of tribal trust assets in order to challenge the actions of Congress, the BIA, and the Seminole Tribe related to the Distribution Act of 1990, the 1991 Usage Plan, and subsequent tribal laws and ordinances that established the scope, procedures, and requirements of the Judgment Fund programs.  Unfortunately for the Band, the instant litigation is neither the time nor the place for such an action, as this litigation touches on none of the underlying issues the Band wishes to advance by intervening in this action.  Inasmuch as the Band takes issue with the 1991 Distribution Act, the BIA's policy regarding issuance of CDIB cards, and tribal ordinances establishing eligibility requirements, those are matters to be taken up at another time and another place.  *See, e.g., Osage VI*, 85 Fed. Cl. at 173 ("In addition, any possible consequences that may arise as a result of this court's rulings are contingent upon actions and events involving intra-tribal determinations that lie outside the scope of this court's authority.").

### d.  Inadequate Representation

Finally, the Band argues that their interest is inadequately represented by the existing parties, stating that the "narrowly tailored issue in this case only concerns the disbursement of judgment fund proceeds to Seminole citizens."  [Docket No. 128], p. 9.  The Band goes on to assert that "[t]he parties have both stated their intention not to include the Freedmen in the distribution of assets that may be awarded as a result of this litigation.  Curiously, the Band states that "[t]he Seminole Nation and the Defendants are

clearly attempting to violate years of established Congressional intent and judicial precedent by excluding the Freedmen, Seminole citizens, from their right to the distribution of tribal funds as Seminole citizen beneficiaries." [Docket No. 128-1], p. 9.

In fact, none of the assertions set forth by the Band have any basis in fact. First, the relationship between the Band and the Seminole Nation of Oklahoma is "properly . . . analogized to the relationship between the United States and its citizens, where the government is presumed adequately to represent an applicant-intervenor's interests." *Osage VI*, 85 Fed. Cl. at 174. *See also, Round Valley Indian Tribes*, 102 Fed. Cl. 634, 636 (Fed. Cl. 2011) ("[T]he Tribes adequately represent any legitimate interests that Proposed Intervenors may have, because the Tribes and their members 'share an interest in maximizing the damages for the breach of trust duties alleged in this action.'"), *quoting Osage VI*, 85 Fed. Cl. at 172. This analogy is strengthened in light of the fact that the Band enjoys active and full participation in the General Council, which has ultimate settlement authority and has consequently served as the decision-making body throughout the instant litigation.[6]   Indeed, a tribal resolution, TR 2011-69, was

---

[6] The fact that the Band *has* actively participated in the General Council throughout this litigation puts that Band in an even more favorable position with the Seminole Nation politically than the headright holders in *Osage VI* who were denied intervention despite allegations that the Osage tribe were not adequately representing their interests in part because the headright holders had neither been kept abreast of tribal decisions nor had they been allowed an opportunity to offer input regarding tribal decisions. *See Osage VI*, 85 Fed. Cl. at 175. The Court of Federal Claims, however, found that the headright holders had failed to provide support for the proposition that their inability to participate in tribal decisions was sufficient to show inadequate representation and further stated that "[t]o the extent that [the headright holders were] dissatisfied with their elected leadership, that [was] a problem that should be addressed through an internal tribal mechanism." *Id.* But given that the Court has previously found that the Band's interest in becoming eligible to participate in Judgment Fund programs is not a legally protectable interest in the context of the instant litigation, the issue of inadequate representation

*unanimously* passed by the Seminole Nation of Oklahoma's General Council on June 28,

2011 which states the following:

> NOW THEREFORE BE IT RESOLVED THAT, The General Council of
> the Seminole Nation of Oklahoma hereby authorizes the Settlement
> Negotiation Team, by and through the Office of the Principal Chief, (1) to
> negotiate a formal settlement agreement consistent with the discussion held
> during the executive session with the Nation's Attorney General; (2) to
> submit the formal settlement agreement and any associated documentation
> to the General Council for final approval . . .

Given the fact that the Band enjoys equal representation on the General Council, the

Court is left to presume that the Band's representatives *have* fully participated in the

settlement negotiations related to this lawsuit.[7]   Any settlement offer that has been

presented to or received from the Defendants in this case *must* have been presented to the

General Council for discussion, debate, and approval in order for the Seminole Nation to

be operating within its own constitution.   The Band's representatives voted *in favor* of

TR 2011-69, authorizing the Settlement Negotiation Team to proceed with settlement

negotiations.   *See*, [Docket No. 131-6].   Indeed, it is difficult to understand how the

Band's interests in this litigation *aren't* being adequately represented when they have

enjoyed and still enjoy full participation in the General Council, the body responsible for

creating and passing resolutions regarding settlement demands and vested with the

---

is wholly irrelevant. *See Chippewa Cree Tribe of the Rocky Boy's Reservation, et al. v. United States*, 85 Fed. Cl. 646, 658 (2009) ("Moreover, the court has already found that Proposed Intervenor's interest in gaining status as PJF beneficiaries does not qualify as a direct an immediate legally protectable interest in this litigation as required . . .  Accordingly, the issue of whether or not the existing parties adequately represent Proposed Intervenors' interest is irrelevant.").

[7] This fact is also applicable to the Band's failure to show that it has been inadequately represented by the existing parties, discussed *supra*.

authority to negotiate on behalf of the Tribe with the United States.   Given the presumption of adequate representation that comes with the relationship between the Band and the Seminole Nation of Oklahoma, which is strengthened by the Band's full participation on the General Council, the court is not convinced that the Band's interest are being inadequately represented.

## II.     Permissive Intervention

In the alternative, the Band urges the Court to allow them permissive intervention pursuant to Fed. R. Civ. Pro. 24(b), which provides that "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact."   Permissive intervention requires a court to "consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."   *Chippewa Cree*, 85 Fed. Cl. at 660 (2009).   "The court has broad discretion in deciding whether to allow permissive intervention."   *Id.*, *citing* 6 James Wm. Moore, Moore's Federal Practice § 24.10[1], at 24-57 (3d ed. 2004) ("The [trial] court possesses broad discretion in determining whether to grant permissive intervention and will rarely be reversed on appeal.").   Further, timeliness is a necessary element of permissive intervention.   *Id.*

The Band argues only that "the Freedmen share with the Plaintiff, Seminole Nation, a common question of law involving the right of Seminole citizens to benefit in the distribution of settlement proceeds from the judgment fund."   [Docket No. 128-1], p. 10.   Further, the Band asserts that its "rights will be impaired without their participation

in settlement negotiations because of the parties' intentions to exclude them from their legal beneficial interests." [Docket No. 128-1], p. 10.

First, for the reasons discussed above, the Band's motion is untimely, which acts as a bar to a grant of permissive intervention under Fed. R. Civ. P. 24(b). *See Osage VI*, 85 Fed. Cl. at 177 ("Because the court has already decided that Proposed Intervenors' Motion does not meet the timeliness requirement . . . permissive intervention is inappropriate."). However, even if the Band's motion was timely filed, the Band's motion still does not satisfy the remaining requirements of permissive intervention, because the Band's purported claim, *i. e.*, that they are entitled to a share of the distribution of Judgment Funds, does not have any question of law or fact in common to the underlying action, *i. e.*, a claim alleging mismanagement of tribal trust assets. *See Karuk Tribe of California v. United States*, 27 Fed. Cl. 429, 432 (1993). Further, the Band is adequately represented in this litigation through its participation in the Seminole Nation General Council, as discussed above. Since the court must also consider whether an intervenor would burden or prolong the proceedings by filing a counterclaim or motions on extraneous issues, the court concludes that allowing the Band to intervene in this litigation on claims that are speculative and not presently at issue in this litigation would certainly and significantly impact the course of this litigation. This is especially true given that this case, after more than four years of ongoing litigation, is on the verge of settlement. For all of the reasons discussed, the court finds that the Band has failed to satisfy the requirements for permissive intervention under Fed. R. Civ. Pro. 24(b).

### III.    Conclusion

For the reasons discussed above, the Band has not shown that it is entitled to intervention of right under Fed. R. Civ. P. 24(a).  The Band's motion is untimely, and they have failed to show that they possess a legally protectable interest in the underlying litigation.  Further, the undersigned finds that any interest that they may possess in benefitting from Judgment Fund proceeds will not be hindered by any judgment the court may enter in relation to the alleged mismanagement of tribal trust assets.  Finally, the Band's interests in the proper management of tribal trust assets appear to be adequately represented by the Seminole Nation of Oklahoma.  The undersigned also finds that the Band has failed to prove that they are entitled to permissive intervention under Fed. R. Civ. P. 24(b).  Therefore, the Band's Motion to Intervene [Docket No. 128] shall be DENIED.

**DATED** this 22nd day of January, 2013.

Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma